T.C. Memo. 1996-288

UNITED STATES TAX COURT

JOSEPH NACHMAN, Petitioner <u>v</u>. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket No. 623-94.                    Filed June 20, 1996.

Joseph Nachman, pro se.

<u>Brian Condon</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined that, for 1988, petitioner is liable for a deficiency in Federal income tax of $63,600 and additions to tax of $10,779 for failure to timely file under section 6651(a) and $3,281 for negligence under section 6653(a)(1).

After concessions,[1] the issues for decision are:

1.  Whether petitioner's transfer of $350,000 to Swirl, Inc. (Swirl), in October 1986 was a loan or a contribution to capital. We hold that it was a loan.

2.  Whether, based on our holding that petitioner lent $350,000 to Swirl, petitioner may deduct as a bad debt $290,325, as respondent contends; $308,000, as petitioner contends; or some other amount.  We hold that petitioner may deduct the amount that Swirl owed petitioner less the amount that petitioner owed Swirl on December 31, 1988.

3.  Whether petitioner is liable for the addition to tax for failure to file under section 6651(a).  We hold that he is.

Section references are to the Internal Revenue Code in effect for the year in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.  <u>Petitioner</u>

Petitioner lived in New York City when he filed the petition.  Petitioner received a bachelor of science degree in economics from the Wharton School at the University of Pennsylvania in 1968.  Larry Nachman is petitioner's brother.

---

[1] Respondent concedes that petitioner is not liable for the addition to tax for negligence for 1988.

B.   Swirl, Inc.

Swirl was incorporated in South Carolina on March 4, 1954. Swirl's sales and executive offices were in New York City.  Swirl owned 100 percent of the voting stock of Swirl Sales, Inc. (Swirl Sales), and Easley Realty Co. (Easley).  Swirl Sales was incorporated in New York.  Easley was incorporated in South Carolina.  Swirl and Swirl Sales designed, manufactured, and distributed women's robes, loungewear, and intimate apparel which were sold to specialty stores in the United States, Canada, Japan, Great Britain, Germany, France, and the Middle East.

C.   Petitioner's Employment By and 50 Percent Ownership
     Of Swirl

Petitioner began to work in the sales and executive offices of Swirl in 1970.  Petitioner became assistant to the president in 1972, vice president in 1975, and executive vice president and co-chief executive officer in 1979.  Petitioner and his brother began to manage Swirl in 1975.

Petitioner and his brother each acquired 50 percent of Swirl's stock in 1979.  Petitioner became Swirl's president and co-chief executive officer in 1983.  Almost all of petitioner's income from 1970 to 1988 was from Swirl.

Petitioner and his brother obtained a 50-percent-undivided interest in the Easley Plant and a 40-percent-undivided interest in Ware Place at a date not specified in the record.  The Easley

Plant and Ware Place are parcels of land and facilities in South Carolina.

In 1982, petitioner and his brother bought Swirl's main manufacturing and distribution facility for $625,000 (facility purchase). Petitioner and his brother each executed a purchase money mortgage for $312,500. The purchase money mortgages required petitioner and his brother to pay interest for the first 5 years and to repay the principal over 10 years. Petitioner and his brother rented the facility to Swirl. Petitioner's share of Swirl's rental payments was about $140,000 per year starting in 1985.

Swirl's net sales and net profits (losses) were as follows:

| Fiscal Year | Net Sales | Net Profits (Loss) |
|---|---|---|
| 1983 | $19,450,740 | ($23,342) |
| 1984 | 21,692,838 | (260,531) |
| 1985 | 21,453,412 | 101,728 |
| 1986 | 18,108,296 | (658,144) |
| 1987 | 16,127,276 | (272,197) |
| | 96,832,562 | (1,112,486) |

In May 1985, petitioner lent $270,000 to Swirl. The May 1985 loan was subordinated to the claims of all Swirl creditors. Swirl paid about $30,000 of interest each year to petitioner on this loan.

In 1986, Swirl ended its licensing agreement with Bill Tice, one of its designers. As a result, Swirl had losses. Shortly

after Swirl ended the Bill Tice agreement, Swirl introduced the Oscar de la Renta product line under a business plan it designed to eliminate the losses.

D.    Swirl's Line of Credit With Chemical Bank

In the mid-1980's, Swirl had a $3.8 million line of credit with Chemical Bank which was secured by Swirl's trade accounts receivable, machinery and equipment.  Swirl had borrowed $3.3 million against its line of credit by January 1986.

In January 1986, Chemical Bank became unhappy with Swirl as a customer.  Chemical Bank believed that Swirl was not meeting the standards Chemical Bank set for its borrowers.  Chemical Bank froze Swirl's line of credit in January 1986.  At that time, Swirl had serious financial difficulties and needed the line of credit for working capital.  Lack of working capital precluded Swirl from buying enough raw materials and filling orders. Swirl began to lose money.

Chemical Bank told Swirl in March 1986 that it no longer wanted to have Swirl as a customer and wanted another lender to assume the $3.3 million line of credit.

Chemical Bank had a workout division which handled loans it made to companies that were financially troubled.  The workout division tried to maximize Chemical Bank's recovery on loans by liquidating the loans or by taking other steps.  The workout division generally did not help borrowers find new financing; it concentrated on trying to get borrowers to repay the loans.

Chemical Bank transferred Swirl's account to its workout division in March 1986.

Swirl needed about $3.8 million to operate, but only had enough collateral to secure a $3.3 million loan.  Swirl sought debt financing from five lenders but was not successful.  No lender would lend Swirl $3.8 million without additional collateral from Swirl or a capital infusion from Chemical Bank. In May 1986, Swirl hired Financo, Inc. (Financo), a subsidiary of Shearson Lehman Brothers, Inc., to find a buyer or investor for Swirl.  Financo found neither.

E.   Chemical Bank and Swirl's New Financing Arrangement

1.   The New Agreement

In September 1986, Chemical Bank told Swirl that it was willing to continue to lend funds to Swirl if its financing arrangement could be restructured.  Swirl and Chemical Bank executed a new financing agreement (new agreement) on October 15, 1986, which gave Swirl a revolving line of credit secured by 80 percent of the net amount of its receivables.  About $1.5 million of the old line of credit was replaced by two promissory notes payable to Chemical Bank.  The promissory notes required Swirl to pay eight quarterly installments of $187,500 starting on January 15, 1987, and interest at a rate of 2 percent higher than Chemical Bank's prime rate.  The promissory notes were secured by Swirl's accounts receivables, machinery and equipment, and the cash surrender value of its officers' life insurance.

As part of restructuring Swirl's debt, Chemical Bank required petitioner to grant a $1 million lien on his personal residence. Chemical Bank reduced the amount of the lien to $450,000 in April 1987. Chemical Bank also required petitioner and his brother to make $500,000 available to Swirl as working capital.

2. Petitioner's Transfer of $350,000 to Swirl in October 1986

Petitioner and his brother borrowed $500,000 from Nathan Addelstone (Addelstone) (not identified in the record) in October 1986. They executed a second mortgage on the Easley Plant and Ware Place as collateral. Petitioner borrowed $150,000 from Jack Lehman (Lehman) in October 1986.

On October 27, 1986, petitioner transferred[2] $350,000 to Swirl in exchange for two promissory notes. This amount included $250,000 from petitioner's one-half share of the Addelstone loan and $100,000 from the Lehman loan. Swirl agreed to pay interest of prime plus 2 ½ percent monthly starting on November 1, 1986, and to make a balloon payment of the principal on April 1, 1988. The notes were subordinated to the claims of Swirl's other creditors. Also on October 27, 1986, petitioner's brother transferred $250,000, the other half of the Addlestone loan, to Swirl.

_____

[2] By using the terms "transfer" or "advance", we do not intend to characterize the transaction as debt or equity.

Swirl used the $600,000 for working capital.  Swirl reported the transaction as a loan from stockholders in its financial statements dated December 31, 1986, June 30, 1987, and December 31, 1987.

Swirl paid interest to petitioner quarterly.  Swirl paid about $56,841 in interest on the notes, from November 1, 1986, to July 2, 1988.  In April 1987, petitioner and Swirl changed the maturity date on the notes from April 1 to September 15, 1988.  Later, they changed the maturity date from September 15 to October 15, 1988.

F.   Petitioner and His Brother's Resignation From and Sale of Swirl

1.   Sale of Swirl

On May 13, 1988, Swirl, Swirl Sales, Easley, Chemical Bank, petitioner, and petitioner's brother agreed to restructure some of Swirl's debt to Chemical Bank.  Shortly thereafter, Chemical Bank told petitioner that it wanted to end its lending relationship with Swirl.

Swirl hired Anthony Gasson (Gasson) in July 1988, to arrange new debt financing for Swirl.  Gasson specialized in finding buyers and lenders for troubled companies.  Swirl hired Joseph Santalarsci (Santalarsci), an investment banker, in September 1988 to find a buyer for Swirl.

Petitioner and his brother resigned from Swirl in October 1988. In October 1988, Santalarsci and Gasson sought offers to buy Swirl. In January 1989, four parties offered to buy Swirl.

### 2. The Three Rejected Offers

I. Appel Corp. offered to buy some of Swirl's assets. L.G. Strelecki, on behalf of a company to be incorporated as L.G. Strelecki & Associates, offered to assume some of Swirl's liabilities in exchange for specific assets. The Shearson Group offered to assume some of Swirl's liabilities in exchange for specific Swirl assets. Swirl rejected these offers.

### 3. The Accepted Offer

On January 24, 1989, the Sandhurst Co. (Sandhurst) offered to acquire substantially all of Swirl's assets and liabilities. Swirl accepted Sandhurst's offer.

New Swirl, Inc. (New Swirl), was incorporated and bought Swirl's assets in November 1989. New Swirl's shareholders were Sandhurst Venture Fund-I, L.P., Whitby Santalarsci & Company, and T.G. Capital, Inc. New Swirl did not buy any Swirl stock or assume Swirl's liabilities to petitioner or his brother. Petitioner did not sue to recover any unpaid interest or principal on the notes from Swirl.

### G. Petitioner's 1988 Tax Return

Jeffrey Elias (Elias), a certified public accountant at Weinick Sanders & Company, was petitioner's accountant. He prepared petitioner's 1988 tax return. Elias discussed the 1988

return with petitioner before completing it. Elias estimated petitioner's losses from Swirl. Elias filed a request to extend the time to file petitioner's 1988 tax return to August 15, 1989 (Form 4868). Petitioner estimated on the Form 4868 that he had no additional tax liability for 1988. On August 19, 1989, petitioner requested an extension of time to file his 1988 return to October 15, 1989, which respondent granted.

Elias expected petitioner to receive a refund for 1988. In calculating petitioner's potential tax liability, Elias concluded that petitioner owed Swirl $42,500 ($312,500 that petitioner owed to Swirl from the facility purchase minus $270,000 that Swirl owed to petitioner from the May 1985 loan). He also concluded that petitioner was entitled to deduct a bad debt loss of $307,500 ($350,000 transferred to Swirl minus $42,500).

H.   Petitioner's Financial Records

Petitioner was involved in a divorce proceeding from July 1988 to May 1989. He gave his financial records to the law firm which represented him. After the divorce proceeding ended, petitioner stored his financial records and other personal belongings. Petitioner found the financial records in July 1990.

Petitioner filed his 1988 return on October 17, 1990. He deducted $308,000 for his bad debt to Swirl. Petitioner claimed a $20,486 refund. Respondent refunded that amount to petitioner on November 19, 1990.

OPINION

A.    Whether the $350,000 Petitioner Transferred to Swirl
      Was Debt or Equity

      1.    Background and Contentions of the Parties

      Petitioner transferred $350,000 to Swirl on October 27,
1986.  He deducted $308,000 of that amount as a bad debt on his
1988 return.  Sec. 166(a)(1).  Respondent determined and contends
that the $350,000 payment was a capital contribution.[3]

      Whether a payment to a corporation is a contribution to
capital or a loan is a question of fact.  Gilbert v.
Commissioner, 262 F.2d 512, 513 (2d Cir. 1959), affg. T.C. Memo.
1958-8.  The substance and not the form of the transaction
controls.  Gregory v. Helvering, 293 U.S. 465 (1935); 1432
Broadway Corp. v. Commissioner, 160 F.2d 885 (2d Cir. 1945),
affg. 4 T.C. 1158 (1945).  We apply special scrutiny because
petitioner transferred the funds in issue to his closely held
corporation.  Fin Hay Realty Co. v. United States, 398 F.2d 694,
697 (3d Cir. 1968).

      The factors we consider in deciding whether payments to a
corporation are debt or equity include:  (a) The name given to
the certificate evidencing the indebtedness; (b) whether there is
a fixed maturity date; (c) whether the party providing the funds

---

[3] Respondent concedes that, if the $350,000 is debt,
petitioner may claim a business bad debt deduction under sec.
166(a).

can enforce payment; (d) the source of the payments; (e) whether the party providing the funds is given an increased participation in management; (f) the intent of the parties; (g) whether the corporation is adequately capitalized; (h) whether interest is paid; (i) whether the corporation can obtain loans from outside lenders; (j) the extent to which the corporation uses the advance to acquire capital assets; (k) whether shareholders provide funds in proportion to their stock interests; (l) whether the business repaid the amount advanced when due; and (m) whether the business' obligation to repay the advance is subordinated to other creditors. Selfe v. United States, 778 F.2d 769, 773-774 n.9 (11th Cir. 1985); American Offshore, Inc. v. Commissioner, 97 T.C. 579, 602-606 (1991); Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 493 (1980); Georgia-Pacific Corp. v. Commissioner, 63 T.C. 790, 796-800 (1975). No single factor controls. John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946); Plantation Patterns, Inc. v. Commissioner, 462 F.2d 712, 719 (5th Cir. 1972), affg. T.C. Memo. 1970-182; Georgia-Pacific Corp. v. Commissioner, supra; Blum v. Commissioner, 59 T.C. 436, 440 (1972); see also American-LaFrance-Foamite Corp. v. Commissioner, T.C. Memo. 1959-101, affd. 284 F.2d 723 (2d Cir. 1960).

    2.    Factors Favoring Petitioner

        a.    Name Given to the Certificate Evidencing the Indebtedness

Respondent concedes that petitioner's transfer of $350,000 to Swirl has all the formal indicia of a loan; e.g., Swirl gave two promissory notes that provided for the payment of interest in exchange for the transfer; Swirl treated the transfer as a loan on its financial statements and tax return; and petitioner reported Swirl's payments as interest income on his tax returns. This factor suggests that the transfer was a loan.

b. Whether the Party Providing the Funds Can Enforce Payment

A definite obligation to repay an advance suggests that it is a loan. American Offshore, Inc. v. Commissioner, supra at 603. Petitioner had the right to enforce payments on the notes. If any payment was past due, petitioner could accelerate the payments due on the notes and collect those amounts and any remaining principal. This factor suggests that the transfer was a loan.

c. Whether There Is a Fixed Maturity Date

The absence of a fixed maturity date suggests that a transfer is equity. American Offshore, Inc. v. Commissioner, supra at 602. Swirl's promissory notes included a fixed maturity date. However, respondent points out petitioner agreed to delay the maturity date of the notes from April 1 to September 15, 1988, and then to October 15, 1988. Respondent cites Ambassador Apartments, Inc. v. Commissioner, 50 T.C. 236 (1968), affd. 406 F.2d 288 (2d Cir. 1969) for the proposition that the delay in the

maturity date shows petitioner had no desire to protect his interest as a creditor, suggesting that the transfer was equity. In Ambassador Apartments. Inc., the taxpayers transferred assets to a corporation in exchange for stock and a promissory note. Id. at 239. The note required monthly payments of principal and interest for 10 years and payment of the balance due after 10 years. Id. The taxpayer and corporation later agreed to relieve the corporation of its obligation to pay principal and interest for 5 years. Id. We held that this modification showed that the transfer was equity. Id. at 246.

The facts here are different from those in Ambassador Apartments. Petitioner and Swirl changed the maturity date: There was no obligation to amortize principal. We believe that petitioner was interested in protecting his rights as a creditor. This factor suggests that the transfer was a loan.

d. Source of the Payments

If repayment of principal or interest is required only if the corporation has earnings, the advance is more likely to be equity. Estate of Mixon v. United States, 464 F.2d 394, 405 (5th Cir. 1972); American Offshore, Inc. v. Commissioner, supra at 602.

The notes required Swirl to pay petitioner interest each month and to pay the principal on April 1, 1988. The note did not make repayment of principal or interest dependent upon Swirl

having earnings.  This factor suggests that the transfer was a loan.

### e. Whether the Party Providing the Funds is Given an Increased Participation in Management

A taxpayer's payment is more like equity if, in exchange for it, the taxpayer is given an increased right to participate in management.  American Offshore, Inc. v. Commissioner, supra at 603.  Petitioner's transfer of $350,000 did not increase his right to participate in Swirl's management.  This factor suggests that the transfer was a loan.

### f. Intent of the Parties

The intent of the parties may show whether a transfer of funds was debt or equity.  Ambassador Apartments, Inc. v. Commissioner, supra at 246.  If a corporation does not make required payments or a shareholder does not enforce his or her right to receive payments, an advance appears more like equity than debt.  Id.

Petitioner testified that he and Swirl intended the transfer to be a loan.  Swirl treated the notes as debt on its financial statements and Federal income tax returns.  Petitioner reported Swirl's payments as interest income on his tax returns.

Respondent points out that petitioner did not sue Swirl or New Swirl to recover amounts due under the notes.  Respondent contends that this fact and the fact that Swirl did not repay the

principal amount of the note show that petitioner's transfer was equity. We disagree.

Petitioner testified that he did not want to spend money and effort in a futile attempt to collect. Another reason for not suing was to avoid problems with Chemical Bank. Chemical Bank set the terms by which Sandhurst acquired Swirl. Gasson testified that, if petitioner had insisted that Swirl or New Swirl repay amounts due on the notes, Chemical Bank would have not agreed to the sale to Sandhurst. After examining all the facts, i.e., how petitioner and Swirl treated the advance on financial statements and tax returns and that petitioner did not sue on the notes, we conclude that Swirl and petitioner intended the advance to be loan. This factor suggests that the transfer was a loan.

g. Whether the Borrower Is Adequately Capitalized

An advance to a corporation is more likely to be equity if the corporation is thinly capitalized. Gilbert v. Commissioner, 248 F.2d 399, 407 (2d Cir. 1957), remanding T.C. Memo. 1956-137; American Offshore, Inc. v. Commissioner, 97 T.C. at 604. To calculate a debt to equity ratio, we compare a corporation's total liabilities to its stockholders' equity. Bauer v. Commissioner, 748 F.2d 1365, 1369 (9th Cir. 1984), revg. T.C. Memo. 1983-120. The difference between assets and liabilities is stockholders' equity. Bauer v. Commissioner, supra at 1369.

No specific ratio of debt to equity determines whether a corporation is adequately capitalized. 2554-58 Creston Corp. v. Commissioner, 40 T.C. 932, 937 n.3 (1963). We have held that debt to equity ratios of 800 to 1, American Offshore, Inc. v. Commissioner, supra at 604; 205 to 1, 2554-58 Creston Corp. v. Commissioner, supra at 937; and 123 to 1, Ambassador Apartments v. Commissioner, supra at 245, showed that an advance was equity. In Bauer v. Commissioner, supra at 1370, the U.S. Court of Appeals for the Ninth Circuit held that debt to equity ratios ranging from 2 to 1 to almost 8 to 1 did not show that advances were equity. In Kraft Foods Co. v. Commissioner, 232 F.2d 118, 127 (2d Cir. 1956), the U.S. Court of Appeals for the Second Circuit held that a debt to equity ratio of .77 to 1 did not show that advances were equity.

Swirl's debt to equity ratios were as follows:

| Year | Liabilities | Equity | Debt-Equity Ratio |
|------|-------------|--------|-------------------|
| 1983 | $5,171,502 | $2,234,108 | 2.31 to 1 |
| 1984 | 6,382,277 | 1,973,577 | 3.23 to 1 |
| 1985 | 5,876,278 | 2,075,305 | 2.83 to 1 |
| 1986 | 6,807,846 | 1,417,161 | 4.89 to 1 |
| 1987 | 6,667,408 | 1,144,964 | 5.82 to 1 |

This chart is based on audited fiscal yearend Swirl financial statistics. Based on an unaudited mid-fiscal-year Swirl balance sheet, respondent contends that Swirl's debt to equity ratio was 6.4 to 1 on December 31, 1987. Even if respondent's computation is proper, these ratios do not establish

that petitioner's transfer to Swirl was equity.  This ratio is consistent with holdings that the transfer was a loan.

      h.    Whether Interest is Paid

A shareholder's failure to insist on receiving interest may show that his or her relationship to the corporation is more like that of a shareholder than a creditor.  American Offshore, Inc. v. Commissioner, supra at 605.  See also Stinnett's Pontiac Serv. v. Commissioner, 730 F.2d 634, 640 (11th Cir. 1984), affg. T.C. Memo. 1982-314.

The promissory notes Swirl exchanged for petitioner's $350,000 advance required Swirl to make monthly interest payments based on an interest rate of prime plus 2 ½ percent starting on November 1, 1986.  Swirl paid interest to petitioner quarterly. Swirl paid a substantial amount of interest on the notes.

Respondent contends that the advance was equity because, from November 1, 1986, to July 2, 1988, Swirl paid interest to petitioner quarterly instead of monthly, and because Swirl paid petitioner less than the full amount of the interest it owed on the notes.  Respondent concedes that Swirl paid petitioner about two-thirds or three-fourths of the interest it owed petitioner. Even though Swirl paid only quarterly and did not pay all required interest, we believe that petitioner was concerned about and did receive a substantial amount of interest.  This factor suggests that the transfer was a loan.

### i. The Extent to Which the Advance Is Used To Acquire Capital Assets

An advance is more like equity if it is used to acquire capital assets. Estate of Mixon v. United States, 464 F.2d at 410. Swirl used the $600,000 transferred by petitioner and his brother as working capital. This factor suggests that the transfer was a loan.

### 3. Factors Which Are Neutral

#### a. Whether an Outside Lender Would Have Lent Funds to the Corporation When The Advance Was Made

If an outside source would not lend funds to a corporation when funds are advanced by a shareholder, the advance is more likely to be equity. Estate of Mixon v. United States, 464 F.2d at 410; American Offshore, Inc. v. Commissioner, supra at 605. If the shareholder's advance was made under terms that are far more speculative than an outside lender would accept, the advance is likely to be a loan in name only. Fin Hay Realty Co. v. United States, 398 F.2d at 697; Segel v. Commissioner, 89 T.C. 816, 828 (1987).

Respondent contends that no reasonable lender would lend money to Swirl when petitioner made the $350,000 advance because Swirl had losses in 3 of the 4 fiscal years before petitioner made the advance in 1986, Chemical Bank wanted to end its lending relationship with Swirl, and Swirl had a working capital shortfall which created losses of about $1 million from September 30, 1985, to September 30, 1986. Respondent also

points out that five potential lenders refused to replace Chemical Bank as Swirl's creditor. Respondent contends that this shows that Swirl could not borrow funds from an outside source when petitioner transferred the $350,000 in October 1986. We disagree. First, Swirl had a profit in 1985, the year preceding the year petitioner made the advance at issue. Second, in September 1986, Chemical Bank told Swirl that it would not require Swirl to find new financing. In October 1986, Chemical Bank executed the new agreement with Swirl. The execution of the new agreement shows that Swirl could continue to borrow funds from an outside lender.

However, the new agreement with Chemical Bank required petitioner and his brother to provide $500,000 of working capital to Swirl. Petitioner has not shown that an outside lender would have provided funds to Swirl under the same terms as were accepted by Petitioner and his brother. Because Swirl could borrow funds when petitioner made the advance, but not under the same terms, we conclude that this factor is neutral.

b.   Whether Shareholders Provide Funds In Proportion to Their Stock Interest

An advance is more likely to be equity if it is proportionate to the shareholder's stock ownership. Segel v. Commissioner, supra at 830. A sharply disproportionate ratio between a stockholder's percentage stock holdings and debt, however, may indicate that the advance is debt. American

Offshore, Inc. v. Commissioner, 97 T.C. at 604-605; Leach Corp. v. Commissioner, 30 T.C. 563, 579 (1958).

Petitioner and his brother each held 50 percent of Swirl's stock.  Petitioner advanced $350,000, and his brother advanced $250,000.  The $350,000 is about 58 percent of $600,000 ($350,000 plus $250,000).  Petitioner's advance was neither proportionate nor sharply disproportionate to his share of Swirl stock.  This factor is neutral.

4.    Factors Which Favor Respondent

a.    Whether The Loan is Subordinated to Other Obligations

If repayment of an advance is subordinated to claims of other creditors, it is more likely to be equity.  American Offshore, Inc. v. Commissioner, supra at 603; Ambassador Apartments, Inc. v. Commissioner, 50 T.C. at 246; 2554-58 Creston Corp. v. Commissioner, 40 T.C. at 937 n.3.  The notes petitioner received from Swirl were subordinated to the interests of Chemical Bank.  This factor suggests that the transfer was equity.

b.    Whether Swirl Repaid the Amount Advanced When Due

Subsequent payment history may show whether the recipient of an advance intended to repay it when it was made.  American Offshore, Inc. v. Commissioner, supra at 606; see Diamond Bros. Co. v. Commissioner, 322 F.2d 725, 732 (3d Cir. 1963), affg. T.C. Memo. 1962-132; Wilbur Sec. Co. v. Commissioner, 279 F.2d 657,

662 (9th Cir. 1960), affg. 31 T.C. 938 (1959). This could be the case if it appears that the recipient of the transfer treats an obligation to repay the transfer as less bona fide than its other obligations, such as, for example, if the recipient of the funds paid other expenses or made other payments to the person providing the funds while not repaying the advance at issue. Swirl did not pay petitioner the principal on the notes, and New Swirl did not assume petitioner's $350,000 advance as a liability, even though it bought Swirl's assets and assumed most of its liabilities. This factor suggests that the transfer was equity.

### 5. Conclusion

While no single factor controls, according to the preponderance of the evidence, we hold that petitioner's $350,000 advance was debt.

## B. The Amount of Petitioner's Bad Debt Deduction for 1988[4]

### 1. Petitioner's Calculation

Elias calculated petitioner's 1988 bad debt deduction by netting the face amounts of the facility purchase mortgage, the May 1985 loan, and the $350,000 October 1986 loan. Elias first subtracted $270,000, the amount of the May 1985 loan which Swirl was required to pay petitioner, from $312,500, the face amount of the facility purchase mortgage which petitioner owed to Swirl,

---

[4] The parties agree that if the advance is debt it became worthless in 1988.

yielding $42,500 that petitioner owed to Swirl. He then subtracted the remaining $42,500 from the $350,000 yielding $307,500. Petitioner deducted $308,000[5] for his bad debt from Swirl.

### 2. Respondent's Calculation

Respondent and petitioner used the same three transactions to calculate petitioner's 1988 bad debt deduction. However, respondent used loan balances from a March 31, 1989, balance sheet. Respondent used the $154,175 balance on the facilities mortgage that petitioner owed to Swirl. Respondent subtracted the $94,500 balance on the May 1985 loan that Swirl owed to petitioner, yielding $59,675 that petitioner owed to Swirl. Respondent subtracted $59,675 from petitioner's October 1986 $350,000 loan to Swirl, yielding $290,325. Thus, respondent contends that if petitioner had a bad debt, then petitioner may deduct only $290,325.

### 3. Analysis

The following compares petitioner's and respondent's computations:

---

[5] Petitioner apparently made a $500 error, which he has not explained.

|  Transaction | Petitioner's Calculation | Respondent's Calculation |
|---|---|---|
| Facilities mortgage | ($312,500) | ($154,175) |
| May 1985 loan | 270,000 | 94,500 |
| October 1986 loan | 350,000 | 350,000 |
| Net amount owed to petitioner | 307,500 | 290,325 |

We disagree with both parties' calculations in part because they used improper amounts for the facilities mortgage and the May 1985 loan. We disagree with petitioner's calculation because petitioner used the original face amounts of the loans. We disagree with respondent's calculation because respondent used balances on March 31, 1989. The parties should have used the balances on December 31, 1988.

We would conclude that petitioner might deduct as a bad debt for 1988, the net amount of the balances on December 31, 1988, of the facilities mortgage, May 1985 loan, and October 1986 loan if the record included those amounts. However, it does not. Petitioner has the burden of proof on this issue. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Thus, we limit petitioner's deduction to $290,325.

C. Whether Petitioner Is Liable for the Addition to Tax for Failure To File

Respondent determined that petitioner is liable for the addition to tax under section 6651(a)(1) for not timely filing his tax return. A taxpayer is not liable for this addition to tax if he or she shows that the failure to file was due to

reasonable cause and not willful neglect. Sec. 6651(a)(1). Reasonable cause means that the taxpayer exercised ordinary business care and prudence, but could not timely file the return. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

Petitioner contends that he had reasonable cause for not filing by October 15, 1989, because he did not have his financial records until July 1990. We have held that an illness which kept taxpayers from their records was reasonable cause for late filing. Hayes v. Commissioner, T.C. Memo. 1967-80. However, here, petitioner did not claim illness or similar reason for not having his records. Rather, he testified that his records were in storage in a room about 6 feet high, 7 feet wide and 9 feet long, packed with furniture and boxes. He looked for the box, but did not find it until he moved everything out of the storage area in July 1990. He had his records in storage since May 1989. Petitioner did not explain why there was a 3-month delay between when he found his records (July 1990) and when he filed his return (October 1990).

Petitioner contends that he had reasonable cause for not filing earlier because he believed that he would get a refund. We have held that a taxpayer's failure to timely file a return because he or she believed no taxes were due is not reasonable cause under section 6651(a)(1). Colbert v. Commissioner, T.C. Memo. 1992-30; Worm v. Commissioner, T.C. Memo. 1980-481; Armaqanian v. Commissioner, T.C. Memo. 1978-305; Fox v.

<u>Commissioner</u>, T.C. Memo. 1975-64; <u>Lowe v. Commissioner</u>, T.C. Memo. 1955-150.

We hold that petitioner is liable for the addition to tax for failure to timely file his 1988 tax return.

To reflect the foregoing and concessions,

<u>Decision will be entered under Rule 155</u>.